# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 11-578 |
| THEODORE BATTISTA | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM AND MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SPECIAL PROBATION PURSUANT TO TITLE 18, UNITED STATES CODE, SECTION 3607

The defendant, Theodore Battista, comes before the Court seeking "Special Probation" despite the crimes he has committed while at work manufacturing military helicopters for The Boeing Company, which are used in sensitive military operations all over the world. Special probation would render any background check by a future employer useless for learning that this individual was part of the outrageous and extremely dangerous drug culture at the Boeing plant.

In consideration of the defendant's lack of criminal history and medical-related addiction issues, the government respectfully requests that the Court fashion a sentence under the guidelines that affords him an opportunity to address those issues and become a law-abiding citizen. Accordingly, the government respectfully requests that the Court deny the defendant's 3607 motion and sentence the defendant to a guideline sentence. The government also recommends that the sentence include 200 hours of community service at a program that assists military veterans and/or their families.

## I.    BACKGROUND

On September 13, 2013, the defendant pled guilty to Counts One through Three of the information, charging one count of attempted possession of oxycodone and fentanyl (Count

One) and two counts of attempted possession of fentanyl (Counts Two and Three), each count in violation of Title 21, United States Code, Section 846.   The charges stem from his attempts on September 9th and 26th, 2011, to illegally purchase Oxycontin tablets and Actiq lollipops from an individual cooperating with the government inside of a building on The Boeing Company's Ridley Park campus.

## II.   SENTENCING CALCULATION

### A.   Statutory Maximum Sentence

According to the Probation Office, the Court may impose a sentence of one year imprisonment, a year of supervised release, a $1,000 to $100,000 fine, and a $25 special assessment on each of the three counts.   The total maximum sentence is three years' imprisonment, a maximum of one year of supervised release, a $3,000 to $300,000 fine, and a $300 special assessment.

### B.   Sentencing Guidelines Calculation

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

| | |
|---|---|
| Base offense level based on attempted possession of controlled substances, 21 U.S.C. § 844, under U.S.S.G. § 2D2.1: | **8** |
| Adjustment for acceptance of responsibility, under U.S.S.G. § 3E1.1(a) | **- 2** |

**TOTAL OFFENSE LEVEL**        **6**

The defendant has a Criminal History Category of I because he has no prior convictions. PSR ¶ 27.   Accordingly, with a total offense level of 6 and a criminal history category of I, his guidelines range is **zero to six months imprisonment**.   Pursuant to Title 18, United States Code, Section 3561(c)(2), the defendant is eligible for up to five years of probation, and the

guidelines provide that the Court may require as a condition of probation up to six months of intermittent confinement, community confinement, or home detention.    PSR ¶ ¶ 69-72.

## III.    DISCUSSION OF THE SENTENCING FACTORS

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[1]    In this case, the government believes that special probation is not warranted and that the Court should sentence the defendant to a guideline sentence that takes into consideration his drug addiction and medical issues.

---

[1] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the 'not greater than necessary' language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

**A.** **Nature and Circumstances of the Offense and History and Characteristics of the Defendant.**

**I.** **Oxycodone**

"Oxycodone is a semisynthetic opiate manufactured by modifying the chemical thebaine, an organic chemical found in opium.[2] It is the active ingredient in a number of commonly prescribed pain relief medications, including Percocet and OxyContin, that come in a variety of dose strengths.[3] The "[i]ntended use of OxyContin is for long-term relief (up to 12 hours) of moderate to severe pain associated with conditions such as cancer and arthritis."[4] Currently all of the products containing oxycodone are classified by the Drug Enforcement Administration as Schedule II controlled substances.[5]

Oxycodone's chemical structure is similar to codeine and is almost a potent as morphine in its ability to produce opiate-like effects, including euphoria.[6] It works through the central nervous system by altering the user's sense of pain and his or her emotional response to pain, but like other narcotic medications, can impair certain daily activities, including driving and other mental and physical abilities.[7] These side effects – including breathing irregularity or respiratory depression; increased pressure of cerebral and spinal fluid; headaches; nausea; dizziness; seizures; heart failure; and low blood pressure -- are usually mild, but there are more

---

[2] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp

[3] Id.

[4] Id.

[5] Id.

[6] Id.; http://www.teenoverthecounter drugabuse.com/oxycodone.html.

[7] http://www.cesar.umd.edu.cesar/drugs/oxycodone.asp

serious complications and negative effects from using products containing oxycodone, particularly when abused.[8]

      When oxycodone products are used consistent with a doctor's care, signs of addiction can be monitored and controlled more effectively than when used outside of a doctor's care.[9] Accordingly, "when used illicitly, the chances of becoming addicted to it increase exponentially."[10] In part, this is caused by the fact that oxycodone has "many similarities to other drugs of abuse including alcohol, heroin, and marijuana, in that they elevate levels of dopamine, the neurotransmitter linked with pleasure experiences. As a result, prolonged use and abuse of oxycodone medications eventually changes the brain in such a way that a user cannot quit on his or her own, a typical sign of addiction."[11] "Drugs that cause similar effects to oxycodone include: opium, codeine, heroin, methadone, hydrocodone, fentanyl, and morphine."[12] The potential for withdrawal symptoms when using prescription opioids (e.g., oxycodone) is extremely high, especially when the user stops suddenly, and may include severe symptoms such as anxiety, nausea, insomnia, muscle pain, fevers, and other flu like symptoms.[13]

---

[8] Id.

[9] Id.

[10] Id.

[11] Id.

[12] http://www.justice.gov/dea/pubs/abuse/drug_data_sheets/Oxycodone.pdf

[13] Id.

## II. Fentanyl

"Fentanyl is 100 times more potent than morphine as an analgesic," and is extensively used for anesthesia and analgesia but is also used for chronic pain management.[14] Actiq, the type of fentanyl product at issue here, is a "solid formulation of fentanyl citrate on a stick that dissolves slowly in the mouth for transmucosal absorption.[15] "It is intended for opiate-tolerant individuals and is effective in treating breakthrough pain in cancer patients."[16]

"[Fentanyl] is similar to other opioids like morphine or oxycodone in its pharmacological effects and produces analgesia, sedation, respiratory depression, nausea, and vomiting.[17] It also appears to produce muscle rigidity with greater frequency than other opioids.[18] The biological effects are indistinguishable from those of heroin, with the exception that fentanyls may be hundreds of times more potent."[19]

Like oxycodone, fentanyl is classified as a schedule II substance and is abused for its intense euphoric effects.[20] "Fentanyl can serve as a direct substitute for heroin in opioid dependent individuals," but is a very dangerous substitute for heroin because it is much more

---

[14] http://www.deadiversion.usdoj.gov/drugs_concern/fentanyl.pdf; http://www.justice.gov/dea/concern/fentanyl.html

[15] http://www.justice.gov/dea/concern/fentanyl.html

[16] Id.

[17] Id.

[18] Id.

[19] Id.

[20] http://www.justice.gov/dea/concern/fentanyl.html

potent than heroin and results in frequent overdoses that can lead to respiratory depression and death."[21]

### III.    Prescription Drug Abuse is a Rampant National and Local Problem

Prescription drug abuse – despite (or maybe because of) popular misconceptions – is more wide-spread, more destructive, and more dangerous than even street-level drug abuse. Nearly seven million Americans are hooked on prescription drugs, more than are addicted to cocaine, heroin, hallucinogens, ecstasy, and inhalants – combined.[22]   Prescription drugs hook the poor and the rich, the old and the young, the black and the white.[23]   It is an epidemic.[24]   Just like street drugs, prescription drugs are dealt, hand-to-hand, just like baggies of heroin or vials of crack.[25]   And just like street drugs, prescription drug abuse produces the same problems: "addiction, crime and broken families."[26]

In recent years, courts around the country have begun to recognize the same. See, e.g., United States v. Marty, 450 F.3d 687, 690 n.4 (7th Cir. 2006) ("the danger that arises from the sale, misuse, and abuse of OxyContin is not excused by its status as a prescription painkiller.

---

[21] Id.

[22] Prescription Drug Abuse Ravages Youth, MSNBC, July 6, 2009, available at http://www.nbcphiladelphia.com/news/health/Prescription_drug_abuse_ravages_state_s_youth.html.

[23] See also Kimberly Kindy, A Tangled Story of Addiction, Washington Post, Sept. 12, 2008, at A01, available at http://www.washingtonpost.com/wp-dyn/content/story/2008/09/11/ ST2008091103947.html (describing Cindy McCain's addiction to Percocet, and her doctor who supplied her with the drugs lost his license).

[24] Prescription Drug Abuse Called "Epidemic", UPI, July 8, 2005, available at http://www.upi.com/Science_News/2005/07/08/Prescription_drug_abuse_called_epidemic/UPI-13411120831997/; National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[25] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/ 2006/HEALTH/05/16/cnna.passierb/index.html.

[26] Michael Janofsky, Drug-Fighters Turn to Rising Tide of Prescription Abuse, N.Y. Times, March 18, 2004, at A24.

While Marty may have obtained her pills from a pharmacy, rather than a drug dealer, her crime still poses a grave danger to the community."). In United States v. Purdue Frederick Co., Inc., a court noted:

> Prescription drug abuse is rampant in all areas of our country . . . causing untold misery and harm. The White House drug policy office estimates that such abuse rose seventeen percent from 2001 to 2005. That office reports that currently there are more new abusers of prescription drugs than new users of any illicit drugs. As recently reported, "Young people mistakenly believe prescription drugs are safer than street drugs . . . but accidental prescription drug deaths are rising and students who abuse pills are more likely to drive fast, binge-drink and engage in other dangerous behaviors."

495 F.Supp.2d 569, 576 (W.D. Va. 2007); see also McCaulley v. Purdue Pharma, L.P., 2002 WL 398715, at *1 (W.D. Va. 2002) (not precedential) (referring to the "national problem of prescription drug abuse").

Prescription drug abuse in American is responsible for an overwhelming amount of illness and death. After a steady, decade-long national increase in overdose deaths, in 2010 nearly 60 percent of drug overdose deaths in the United States involved prescription drugs.[27] This alarming trend has been driven mainly by street demand for opioid pain relievers such as oxycodone.[28] As a result, in the same time period opioid overdose deaths among women increased fivefold.[29] In 2011, there were 885,348 emergency room cases in which an opioid other than heroin was cited as a reason for treatment – a threefold increase since 2004.[30]

---

[27] Centers for Disease Control and Prevention, Press Release: Opioids drive continued increase in drug overdose deaths, February 20, 2013, available at http://www.cdc.gov/media/releases/2013/p0220_drug_overdose_deaths.html.

[28] Id.

[29] Centers for Disease Control and Prevention, Vital Signs: Overdoses of Prescription Opioid Pain Relievers and Other Drugs Among Women – United States, 1999-2010, July 5, 2013, available at http://www.cdc.gov/mmwr/ preview/mmwrhtml/mm6226a3.htm?s_cid=mm6226a3_w#tab1.

[30] Barry Meier and Bill Marsh, The Soaring Cost of the Opioid Economy, New York Times, June 23, 2013, available at http://www.nytimes.com/interactive/2013/06/23/sunday-review/the-soaring-cost-

Additionally, diversion of prescription drugs into illicit street markets is responsible for increasing violent crime across the nation.[31]   The Eastern District of Pennsylvania is no different.   In Philadelphia and Camden in 2009, there were more than 75 pharmacy robberies and burglaries that resulted in the theft of large quantities of prescription drugs.[32]   In 2010, there were over 100 such robberies, all of which resulted in several million dollars' worth of stolen opioids alone.[33]   Street gangs, traditionally linked to the distribution of illicit drugs, are becoming more involved in prescription drug distribution in order to meet the demand fueled by widespread addiction.[34]   SAMHSA estimates that in 2011, 449,000 Pennsylvanians over the age of 12 used pain relievers for nonmedical purposes – over four percent of the state's population.[35]   Even rural

of-the-opioid-economy.html?_r=1&.

[31]   See National Drug Threat Assessment 2011 at 38; see also, e.g., Prescription drug abuse blamed for increase in Maine crime, Bangor Daily News, June 19, 2012, available at http://bangordailynews.com/2012/06/19/news/state/ maine-crime-rate-up-5-4-percent-in-2011-largest-jump-since-1975; Violent crimes follow prescription-drug abuse, Orlando Sentinel, November 25, 2011, available at http://articles.orlandosentinel.com/2010-11-25/health/os-prescription- drugs-crimes-20101125 _1_prescription-drug-abuse-pain-management-clinics-prescription-drugs; Prescription drug use epidemic linked to violent crime, CalCoastNews.com, September 2012, available at http://calcoastnews.com/2012/09/ prescription-drug-use-epidemic-linked-to-violent-crime/; Jeffrey D. Klein, Committee on Alcoholism and Drug Abuse of the New York State Senate, Prescription Drug Abuse and Violence Against Pharmacies, April 2012, available at http://www.nysenate.gov/files/pdfs/Pharmacy%20Crime%20report %20[final].pdf; Andrea Zelinski, Violent Crimes, Prescription Drug Abuses Targeted, TN Report, January 5, 2012, available at http://tnreport.com/2012/01/05/violent-crimes-prescription-drug-abuses-targeted/; Doug Yearwood, North Carolina Governor's Crime Commission, Prescription Drug Abuse and Diversion: The Hidden Crisis, April 2011, available at https://www.ncdps.gov/div/gcc/pdfs/pubs/ drugdiversion.pdf; Consequences of Prescription Drug Abuse in KY, Kentucky Prescription Drug Abuse Summit, February 2012, available at http://www.justice.gov/ usao/kye/programs/Pill%20Summit%20Revision%20summary %20 Final.pdf.

[32]   National Drug Intelligence Center, Philadelphia/Camden High Intensity Drug Trafficking Area: Drug Market Analysis 2011, U.S. Department of Justice, Document ID: 2011-R0813-027, September 2011 at 6, available at http://www.justice.gov/archive/ndic/dmas/Philadelphia-Camden_DMA-2011(U).pdf.

[33]   Id.

[34]   Id.; see also National Drug Threat Assessment 2011 at 38.

[35]   Substance Abuse and Mental Health Services Administration, 2010-2011 NSDUH State Estimates of Substance Use and Mental Health Disorders: Pennsylvania, 2011, available at http://www.samhsa.gov/data/NSDUH/2k11State /NSDUHsae2011/NSDUHsaePA2011.pdf.

areas of Pennsylvania are increasingly becoming targets for drug dealers and gang activity.[36] State legislators in Pennsylvania are trying to attack the state's prescription drug abuse epidemic through a number of proposed initiatives, regulations, and criminal laws.[37]

In the Eastern District of Pennsylvania, prescription drug abuse is quite significant as well.[38] Local clinics have stated that "drug addiction in both Philadelphia and New Jersey is almost legendary due to its severity. Heroin and opioid-based prescription medication are two of the top drugs abused in these areas. More than four percent of those surveyed in both the Philadelphia area and in New Jersey reported using pain relievers for nonmedical purposes in the past year . . . The rural areas of Pennsylvania, too, are increasingly becoming a target of drug dealers."[39] State legislators in Pennsylvania have been trying to address this growing problem.[40]

Part of the reason that prescription drug abuse is so rampant is because they come with the imprimatur of legitimacy: Doctors hand them out; it is not per se illegal to have them. There is very low social disapproval.[41] The general public − which the Court takes into

---

[36] See http://www.narconon.org/drug-information/pennsylvania-drug-addiction-rehabilitation-treatment.html.

[37] National Conference of State Legislatures, Preventing Prescription Drug Overdose: 2013 Introduced State Legislation, July 16, 2013, available at http://www.ncsl.org/issues-research/health/prevention-of-prescription-drug-overdose-and-abuse.aspx

[38] National Drug Intelligence Center, Philadelphia/Camden High Intensity Drug Trafficking Area Drug Market Analysis, June 2007, available at http://www.justice.gov/ndic/pubs23/23921/abuse.htm.

[39] See http://www.meditoxofpalmbeach.com/philadelphia-new-jersey-opiate-detox.html.

[40] Rafferty Bill Would Crack Down On Prescription Drug Abuse, Fraud, Senate Republican Communications, May 3, 2004, available at http://www.pasenategop.com/news/archived/2004/0504/rafferty-050304-prescrip.htm ("Rafferty noted that prescription drug fraud and abuse are becoming a serious problem in Pennsylvania and other states, and stricter guidelines need to be in place to combat the problem. He said prescription drug abuse accounts for approximately one-third of all drug abuse in the United States.").

[41] See Jason Szep, Grappling With Prescription Drug Addiction, Reuters, July 30, 2008, available at http://features.us.reuters.com/wellbeing/news/S3020463.html.

consideration at the time of sentencing when considering the nature of the defendant's conduct – is grossly misinformed about the danger of prescription drug abuse.   According to a recent poll:

- 40 percent say prescription pills are "much safer" than illegal drugs.

- 31 percent say there is "nothing wrong" with prescription drug use.

- 29 percent think prescription painkillers are non-addictive.[42]

In fact, prescription drugs contain opioids that are just as dangerous as those contained in cocaine and heroin.[43]   This low social disapproval is partly responsible for encouraging continued prescription drug abuse, especially among the young.[44]

In short, the prescription drug problem continues to grow because our society keeps underestimating its seriousness.[45]   It is a "significant threat" in the United States.[46]   Combating prescription drugs drains law enforcement resources because "[d]rug diversion investigations can be complex and take many months."[47]   The investigation here took four years and a large amount of resources – the federal government simply does not have the resources to investigate every

---

[42] Good Medicine Meets Bad Behavior, CNN, available at http://www.cnn.com/ 2006/HEALTH/05/16/cnna.passierb/index.html.

[43] Will Dunham, Study Sees Prescription Drug Abuse at US Colleges, Reuters, Mar. 3, 2008, available at http://www.reuters.com/article/latestCrisis/idUSN03357573.

[44] White House Press Release, Jan. 24, 2008, available at http://www.whitehousedrugpolicy.gov/news/press08/012408.html; see also Prescription Abuse Outstrips Illegal Drug Use, UN Warns, The Guardian, Mar. 1, 2007, available at http://www.guardian.co.uk/society/2007/mar/01/ drugsandalcohol.drugs.

[45] See, e.g., Fredrick Kunkle, Attorney General Targets Prescription Drug Abuse, Washington Post, Oct. 6, 2005, at T03, available at http://www.washingtonpost.com/ wp-dyn/content/article/2005/10/05/AR2005100500007.html (state attorney general noting that "abuse of prescription drugs has gone unnoticed").

[46] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

[47] Tim Reiterman, Prescriptions Supplanting Illegal Substances as Drugs of Choice, L.A. Times, May 18, 2008, available at http://www.latimes.com/news/ custom/scimedemail/la-me-drugs18-2008may18,0,6739996.story.

individual user on the Boeing Company's Ridley Park campus or to conduct similar investigations at every facility that manufactures sensitive equipment or vehicles.

IV.     **Prescription Drug Abuse by Workers at The Boeing Campus's Ridley Park Facility Poses a Specific and Significant Threat to Society**

The defendant in this and the 36 other cases arising out of the purchase and sale of prescription drugs at The Boeing Company's Ridley Park facility is a skilled worker whose employment at The Boeing Company provided him with the opportunity to be in the upper echelon of salary earners in the country: Internal Revenue Service's 2010 database indicates that the top 10% of Americans earn $113,799 per year; the top 25% earn $67,280 per year; and the top 50% earn $33,048.[48]   And unlike junkies and drug dealers on the street, the defendant had options.   The Boeing Company's medical coverage includes drug treatment and counseling, and the company's Employee Assistance program offered them confidential access to drug counselors and inpatient and outpatient drug treatment.   As government witnesses explained to the Court, anyone working at Boeing could get drug treatment offered by the medical plan at no cost to the employee, without a manager even being notified that the employee had a drug problem, and while receiving disability benefits in lieu of salary.   Further, if an employee was in the process of being disciplined for work-related infractions and that employee notified Boeing management that the genesis of their problems was drug addiction, Boeing would offer them treatment that, if successful, would allow them to retain their employment.

What must be considered in determining the appropriate sentence for this defendant is not just the salary, medical benefits and treatment options that the defendant was offered by

---

[48] http://www.financialsamurai.com/2011/04/12/how-much-money-do-the-top-income-earners-make-percent/

virtue of his employment, but also the extremely sensitive nature of his work – work he performed while using and abusing opioids.

The Boeing Company Ridley Park facility produces the CH-47 Chinook and portions of the V-22 Osprey. "The Chinook is a multi-mission, heavy-lift transport helicopter. Its primary mission is to move troops, artillery, ammunition, fuel, water, barrier materials, supplies and equipment on the battlefield. Its secondary missions include medical evacuation, disaster relief, search and rescue, aircraft recovery, firefighting, parachute drops, heavy construction and civil development."[49] Chinooks are currently in use by the U.S. Army, U.S. Army Reserve and National Guard, and International armed forces.[50] It has had wide use in Operation Enduring Freedom in Afghanistan and Operation Iraqi Freedom in Iraq, including use in air assault missions, inserting troops into fire bases and later bringing food, water, and ammunition.[51]  It was particularly useful in the mountainous terrain of Afghanistan where high altitudes and temperatures limited the use of the Black Hawk.[52]

The V-22 Osprey is the first aircraft designed from the ground up to meet the needs of the Defense Department's four U.S. armed services: it "can transport 24 combat troops, 20,000 pounds of internal or up to 15,000 pounds of external cargo using its medium lift and vertical takeoff and landing capabilities; meets U.S. Navy requirements for combat search and rescue, fleet logistics support, and special warfare support; matches the U.S. Special Operations Command's requirement for a high-speed, long-range, vertical lift aircraft; can be stored aboard an aircraft

---

[49] http://www.boeing.com/rotorcraft/military/ch47d/.

[50] http://www.boeing.com/rotorcraft/military/ch47d/docs/CH-47D_overview.pdf

[51] http://www.armedforces-int.com/projects/boeing_ch_47_chinook.html

[52] Id.

carrier or assault ship because the rotors can fold and the wings rotate; [and] has air-to-air refueling capability, the cornerstone of the ability to self-deploy."[53]  As a result, "more than 165 Osprey tiltrotors are currently in operation across 10 Marine Corps and two Air Force Special Operations Command Osprey squadrons. The two services have together logged 16 successful combat, humanitarian, ship-based or Special Operations deployments since 2007. The worldwide Osprey fleet has amassed more than 135,000 flight hours, with nearly half of those hours logged in the past two years."[54]

Each of the Boeing defendants worked on the production of the Chinook, the V-22 Osprey, or both.   The consequences of any undetected errors made in any of the defendants' jobs cannot be understated.   Aside from the fact that most of the defendants were involved in the use of large, heavy machinery in performing their jobs, which put anyone around them in danger when they were impaired, any errors that affected the performance of completed Chinook or V-22 Osprey could prove disastrous, as experience has shown.   For example, in May 2011, the Australian Army grounded its fleet of Chinook helicopters after one of the large troop-carrying aircraft crashed in Afghanistan, killing an army pilot.[55]   There is no indication that the cause of the crash had anything to do with substance abuse by employees on the Boeing's Ridley Park campus, but the story is illustrative of the exponential effect that a problem with a single Chinook or V-22 Osprey could have on military operations: possible injury or death to the crew using the

---

[53] http://www.boeing.com/rotorcraft/military/v22/

[54] http://www.boeing.com/rotorcraft/military/v22/docs/V-22_overview.pdf

[55] http://www.theaustralian.com.au/national-affairs/defence/chinook-fleet-grounded-as-fatal-afghan-crash-investigated/story-e6frg8yo-1226159681671.   The cause of the crash may never be known because the flight recorders were destroyed by a missile soon after the accident.
http://www.dailytelegraph.com.au/news/cause-of-a-helicopter-crash-in-afghanistan-that-killed-army-pilot-lieutenant-marcus-case-may-never-be-known/story-e6freuy9-1226397995791

particular aircraft plus complete grounding of the entire fleet.   In fact, the United States military has also grounded its Chinook and V-22 Osprey fleets when accidents have happened.   For example, the United States Army grounded its 466 Chinook' troop helicopters in August 1999 and advised other militaries to halt flights worldwide after a crack was found in an engine gear of a British Chinook helicopter; the United States Marine Corps grounded its fleet of V-22 Osprey in February 2007 after discovering a glitch in a computer chip that could cause the aircraft to lose control; and grounded its fleet of V-22 Osprey in 2000 after two fatal crashes that killed 23 Marines.[56]

In response to the Section 3607 motions of other defendants, the government presented evidence before this Court that relates to its opposition herein.   In support of the government's opposition, and based on a stipulation with the defendant to the testimony, the government is attaching redacted[57] copies of the transcripts of that hearing in lieu of live testimony.[58]   Here is a summary of each of the witnesses whose testimony is attached hereto.

**Robert Fasold, Corporate Investigator, The Boeing Company:** Mr. Fasold testified, *inter alia*, that by 2005, he was aware that there was a significant drug problem in terms of both illegal distribution and use on the Boeing Company's Ridley Park, PA campus.   Tr. of Hrg., July 11, 2012 (Attachment A), at 36-37.   He also noticed that the number of threat management and assaults were higher than at other Boeing sites, and there was a large volume of

---

[56] http://www.washingtonpost.com/wp-dyn/content/article/2007/02/09/AR2007020901860.html

[57] The government has redacted arguments and discussions that relate to specific defendants that were before the Court at the time and/or relate to the posture of those particular Boeing defendants' cases, all of which involved the misdemeanor charge of attempted purchase of oxycodone or fentanyl.

[58] This stipulated testimony does not limit the defendant in any way from arguing against the government's motion, and is intended only to preserve the resources of the Court by obviating the need for the government to represent this testimony.

theft involving scrap metal.   Id. at 37.   Mr. Fasold recovered significant amounts of drug paraphernalia on the campus, including fentanyl wrappers, sticks that went with them, prescription bottles, bags of cocaine, crack pipes, spoons, and syringes.   Id. at 38, 41, 55-57.   He also conducted surveillance indicating that an employee was distributing Oxycontin and Percocets on the campus.   Id. At 43.   Although Mr. Fasold pleaded with the union, which represents many of the manufacturing workers on the campus, for help to address the drug problems, the problems persisted and drug testing of employees who exhibited signs of impairment were inadequate to detect prescription medications.   Id. 44- 46.   All of this activity continued despite numerous signs and other sources of information clearly informing all Boeing employees that drug use and abuse at the plant would not be tolerated, and that confidential assistance is available to anyone struggling with an addiction.   Id. at 47-54.   Needing greater assistance to combat the problem, Mr. Fasold ultimately requested federal law enforcement assistance in the investigation of the drug trafficking on the campus.   Id. at 47.

      **Steven Ellis (a Boeing defendant):**   Mr. Ellis testified that from the time he began his employment at Boeing in September 2008, he was aware that there was a no tolerance policy for the sale and use of drugs in the workplace.   Id. at 75.   Nonetheless, in 2010, he began to illegally sell prescription drugs on the Boeing campus after noticing that individuals were frequently purchasing and using illegally purchased pills at work.   Id. at 75- 77.   Mr. Ellis realized that he could make money illegally selling prescription pills, most commonly containing oxycodone, without having to advertise or work to develop a customer base because the market was so large at the plant – within little time, Mr. Ellis developed a customer base that included more than 15 regular customers and an extended customer base of approximately 30-40 Boeing employees.   Id. at 77-81, 83.   In addition to selling to various employees, Mr. Ellis observed

several employees who were visibly abusing prescription medications at the plant, and he and other employees took steps to try to prevent management from finding the visibly impaired employees.  Id. at 81-83.

**Jonathan Sullivan (a Boeing defendant):** Mr. Sullivan testified that he learned that there was an illegal market for prescription medications during his first week of employment at Boeing (in January 2009).  Id. at 87-88.  He became addicted to Percocets after a tooth problem and an injury, and quickly learned that it was extremely easy to illegally purchase pills, particularly oxycodone products, at Boeing.  Id. at 88-89, 91.  Sometimes Mr. Sullivan would perform another Boeing employee's work for in exchange for pills.  Id. at 91-92.  Mr. Sullivan estimates that one of every four Boeing employee was using pills at work, including during shifts working on the aircraft being manufactured at the plant.  Id. at 92-93.  Some employees, including Mr. Sullivan, experienced serious effects of withdrawal during the rare occasions that they were unable to obtain pills at the plant, which affected their ability to do their work.  Id. at 93-94.

Mr. Sullivan also stated that employees would try to keep others who were visibly impaired from being discovered by management.  Id. 94-95.  Mr. Sullivan used and knew others to use and/or sell other drugs on the Boeing campus in addition to prescription medications, including cocaine and marijuana.  Id. 95-96.  From the moment employees would arrive on campus for their work shift, the word would go around as to who needed to purchase pills and who had pills to sell.  Id. at 96.  Employees also were able to buy Suboxone on campus, which is a prescription medication that would help opiate addicts in between taking oxycodone.  Id. at 97-98.  Mr. Sullivan used Suboxone® "to help him get through.  Once [he] became addicted to opiates, the need was so overpowering, it overpowered everything else; you could not function

without them. So [he] used Suboxone to – as a replacement for [his] opiates." Id. at 97.

**Charles Haux (a Boeing defendant):** Mr. Haux testified that he became addicted to Percocet in 2006 after an injury, and that he began to illegally purchase pills at Boeing. Id. at 115. Thereafter, he purchased seller quantities of pills from people with doctor's prescriptions, including Boeing employees, using some and selling the rest to other employees. Id. at 115-117. He also testified as to the serious side effects of opiate withdrawal, and that he could purchase Suboxone from Boeing employees when pills weren't readily available. Id. at 119-120. Mr. Haux stated that there was a circle of people at Boeing who used and/or sold pills, and that his customer base consisted of five to 10 purchasers of pills per day. Id. at 121.

**Federal Bureau of Investigation (FBI) Special Agent Raymond Carr:** Special Agent (SA) Carr testified that in 2007, the FBI and Drug Enforcement Administration (DEA) were approached about a drug problem, including the sale and abuse of prescription medications, marijuana, cocaine and heroin, at the Boeing Company's Ridley Park campus. Id. at 142-43. The investigation uncovered widespread use and sales of prescription medications, particularly oxycodone and fentanyl products, of "epidemic proportions." Id. at 143-44, 146.

**David Bouse, Director of Human Resources, The Boeing Company:** Mr. Bouse testified about the operations at the Boeing Company's Ridley Park, PA campus, including the manufacture of the entire Chinook helicopter and the fuselage of the V-22 Osprey. Tr. of Hrg., July 23, 2012 (Attachment B), at 12-13. Mr. Bouse described the drug and alcohol no tolerance program at Boeing, including the testing policy at the Ridley Park, PA campus and the expansion of that policy after the arrests of the Boeing defendants. Id. at 27-36. He explained that the "drug-free workplace" policy is distributed and accessible to all employees. Id. at 30-37, 39-43. He also described how the policy is geared toward rehabilitation, encouraging employees to seek

appropriate confidential treatment that would not be made known to management if voluntarily sought by the employee through the employee assistance program.  Id. At 37-38, 43-55.

**Dr. George Downs, Expert in Pharmacy with a Specialty in Treatment of Substance Abuse:** Dr. Downs testified as to the serious side effects of opioid addiction, including both the euphoric effect it induces and the severe side effects of use and withdrawal.  Id. at 106-13.  He explained that respiratory deaths from opioid use have exceeded deaths from automobile accidents, and that despite feeling euphoric, it is near-impossible for the addicted opioid user to function normally while under the influence.  Id. at 113-22.

**Bernard Jones, Boeing Military Aircraft Director of Operations, The Boeing Company:** Mr. Jones testified that although no actual aircraft accident has been attributed to drug sale and use at the Ridley Park, PA campus because of the quality control redundancy program in place, productivity is negatively affected by absenteeism, non-compliance with work procedures and rules, injuries, illnesses, etc.  Id. at 148-49, 166-67, 171.  Mr. Jones prepared summaries of the number of absences of the Boeing defendants as they compared to the rest of the manufacturing workforce and determined that the number of absences of the Boeing defendants was markedly higher than the number for the rest of the workforce.   The rate of absenteeism became even more disproportionate when Mr. Jones compared all Boeing employees under investigation by the government for illegal drug sales and use with the rest of the manufacturing workforce.  Id. at 148-52.  Mr. Jones also discovered that the number of corrective actions taken against and the number of recordable injuries of the Boeing defendants were higher than the average of the rest of the manufacturing workforce.  Id. at 152-62.  Mr. Jones said that as the person responsible for the production of Boeing Military Aircraft, he believes that drug-impaired employees negatively impact the goals of the facility because Boeing relies on "first-time quality" from all of its employees, which is compromised when employees are drug impaired.  Id. at 164-65.  Drug

impairment also increases the risk of accidents and decreases productivity.   Id. at 165.   Mr. Jones further stated that all of the manufacturing jobs at Boeing are "critical" to production and "to the safety of our – our war fighters and the platforms that we build for them."   Id. at 165-66.   Mr. Jones explained:

> A.    [A] Chinook – the products that we build, it's not – not to make light of stocking shelves at Walmart – but – but these are platforms that take soldiers into harm's way and bring them home everyday.   They – they rely on these products.   You can't stop a Chinook at 10,000 feet, pull it over on the side of the road, because there's a – a defect and – fix it.   Airplanes – when airplanes crack, airplanes kill people.
>
> And, no, to answer the question, can I significantly tie any defect back to any of these 33 today?   No, I can't.
>
> Q.    What has been the military range of response when there are issues with the aircrafts you deliver?
>
> A.    So there's been aircraft – entire fleets that have been grounded, because of safety issues.   Every time there's an occurrence of a – of a defect, the customer has a Safety Board that reviews it, and determines the level of safety up to and including grounding the – the fleet.   It could be that is has flight restrictions from – from the base that its operating on, until that non-conformance can – can be fixed or until we can [find] what aircraft the – the problems are on, and a lot of the times we, the Boeing Company, has to, at our expense, send people out into the field to make the – these repair[s] on these aircrafts.

Id. at 171-72.

## V.    Analysis of the Defendant's Background

The defendant began his employment at Boeing in 2009 and worked as a forklift operator, although he was trained by Boeing to be a Composite Fabricator.   By performing his job while illegally purchasing and using prescription medication, he betrayed the men and women who depended on him to make sure that the helicopters they are flying in are the highest quality machinery our nation can offer them.

For these reasons, the government respectfully requests that the Court deny the defendant's motion for Section 3607 relief and sentence the defendant to an appropriate sentence under the guidelines. The government also recommends that the sentence include 200 hours of community service at a program that assists military veterans and/or their families.

**B.** **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The sentence imposed in this case must fairly punish the defendant for his criminal conduct, and reflect the seriousness of the offense. The government respectfully submits that to give this defendant Section 3607 relief would undercut respect for the law by those with whom he worked, and would not provide a just punishment for his offenses.

**C.** **The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant**

When passing the Sentencing Reform Act, Congress explained:

[It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

Prescription drug abuse is a "significant threat" in the United States.[59] The investigation here took a large amount of government resources and, because of the nature of the plant under investigation and the closed culture of its employees, took many years. Accordingly,

_____

[59] National Drug Intelligence Center, National Drug Threat Assessment 2005, U.S. Department of Justice, Document ID: 2005-Q0317-003, February 2005 at 99.

a guideline sentence is necessary to afford both specific and general deterrence to criminal conduct. The government requests that the Court use its discretion to deny the defendant Section 3607 relief and sentence the defendant to a guideline sentence that would assist him with his addiction issues.

**D.**      **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

In this case, in light of the defendant's need for substance abuse treatment, the government requests that the Court to adjust the defendant's sentence "to provide the defendant with needed medical care, or other correctional treatment in the most effective manner . . ." Section 3553(a)(2)(D).

**E.**      **The Guidelines and Policy Statements Issued by the Sentencing Commission**

As stated earlier, the Guidelines retain their significant importance in advising judges about appropriate sentences. Uniformity in sentencing should be a paramount goal; in order to rid the criminal justice system of unpredictability and possible bias, like offenders should receive like sentences, to the extent possible. The only vehicle for achieving such a goal is through the application of the Sentencing Guidelines. Here, the defendant abused his position as a worker at the Boeing plant and put the lives of the men and women serving the United States and other militaries around the world at risk. His conduct warrants a guideline sentence.

**F.**      **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

A guidelines sentence is necessary when considering the importance of avoiding unwarranted sentencing disparities, another factor that is set forth in Section 3553(a). As an initial matter, this Section 3553(a) factor is not primarily concerned with sentencing disparities in a particular case; it is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. See United States v. Parker, 462 F.3d 273 (3d Cir. 2006);

United States v. Carson, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that "factor 'concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between co-defendants.'").

      **G.**     **The Need to Provide Restitution to Any Victims of the Offense**

Restitution is not an issue in this case.

## IV.   CONCLUSION

For all of the reasons stated above, the government respectfully recommends that the Court deny the defendant's motion for Section 3607 relief and sentence the defendant to a guideline sentence that affords the defendant drug treatment opportunities and requires 200 hours of community service at a program that assists military veterans and/or their families.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


_____/s/_____
FAITHE MOORE TAYLOR
ASHLEY K. LUNKENHEIMER
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I certify that a copy of the GOVERNMENT'S SENTENCING MEMORANDUM has been filed electronically on the Electronic Case Filing system and is available for viewing and downloading from the ECF system, and/or was served by electronic mail on the following defense counsel:

Jeremy H.G. Ibrahim, Esq.
Counsel for Theodore Battista

_____/s/_____
Ashley K. Lunkenheimer
Assistant U.S. Attorney

Date:   November 26, 2013